## A. L. CLAY v. THE STATE.

No. 1668. Decided May 24, 1899.

**1. Murder—Special Venire—Mode of Summoning.**

On an order to summon a special venire of sixty men who had been regularly drawn, the sheriff simply addressed to each venireman a postal card notifying him that he had been drawn and must be present on the day stated when the case was set for trial, and instructed each to tear off the return on the postal card and mail it back to him as a notice that he, the venireman, had been served. The sheriff made up his return on the writ showing only service in the ordinary way, from the replies thus received. Defendant made a motion to quash the writ, setting up the above facts as to the mode of service, and presented the same by way of objection to the impanelment of the jurors in every conceivable way without avail. Held, our statute, article 650, Code of Criminal Procedure, requires a personal service by the sheriff on each juror drawn on the special venire. The service in this case was tantamount to no service at all, and defendant was in fact deprived of a special venire which the law guarantees in murder trials.

**2. Special Veniremen—Excusing by Court.**

There is no authority on the part of the court to excuse special veniremen in the absence of the defendant. Following Livar v. State, 26 Texas Criminal Appeals, 115.

**3. Defendant as a Witness—Recalling to Lay Predicate for Impeachment.**

A defendant who has testified in his own behalf may be recalled to the stand as any other witness for the purpose of laying a predicate for his impeachment.

**4. Murder—Evidence—Acts and Conduct of Defendant Before the Homicide.**

On a trial for murder, it is admissible, competent, and relevant, as tending to show the condition of defendant's mind immediately preceding the homicide, to permit the State to prove that defendant and his brother, who was acting with him, were shortly before the difficulty drinking and carousing and manifesting a turbulent and lawless disposition.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

40th Crim. Reps.—38

Appeal from a conviction for murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The indictment charged appellant with the murder of I. H. Brady, on the 17th day of May, 1898, by cutting him with a knife. .

The evidence in the case is conflicting. The most important witnesses for the State are W. A. Ogden, and Joe Helman, and those most important for the defendant are his brother, E. G. Clay, and defendant himself. These are the only eyewitnesses to the origin and beginning of the difficulty which resulted in the death of Brady.

The State proved by the two witnesses, Ogden and Helman, that they were in company with the deceased at the time of the homicide. These witnesses and deceased were all boarding at Mrs. Rubenstein's, on Ross Avenue, on the night of the killing. On that night, about 12 o'clock, the three went to the Wichita saloon, about 500 feet from the boarding-house, and took a glass of beer. After drinking the beer, they started back to the boarding-house. When they arrived at the corner of Ross Avenue and Lamar Street they stopped and entered into conversation; remained there about fifteen minutes; saw two parties cross Lamar Street diagonally across Ross and Lamar from witnesses. One of the parties said in a loud voice, "There are those sons of bitches now." Witness did not know which one said it. They both came diagonally across the streets to where deceased, Ogden, and Helman were standing, repeating the remark several times. The three,—deceased, Ogden, and Helman,—were standing near together. Neither of the three spoke a word, and when they approached, E. G. Clay threw his arms around Ogden's neck, and they both struggled and fell in the gutter, and defendant, A. L. Clay, seized and struck Brady with his fist. No knife was seen in defendant's hands when he struck Brady. Defendant and Brady fell off the sidewalk, and this is the last Ogden ever saw of Brady alive, and the last he saw of defendant during the fight with Brady. .E. G. Clay and Ogden were still struggling, and Ogden struck E. G. Clay with a brick while the two scuffled together. While this scuffle was going on the brick was being used by Ogden on E. G. Clay, and as they scuffled down Lamar Street, Ogden all the time on top of E. G. Clay, defendant A. L. Clay ran up and cut Ogden with a knife, making a wound about four inches long in the side. Ogden, when cut, fell off of defendant's brother, E. G. Clay, and defendant then remarked to his brother, "Come on; they are after us," and the two went off down Lamar Street, and witness Ogden then went off after a doctor to dress his wound. Ogden while engaged in the struggle with E. G. Clay heard three pistol shots, but don't know who fired them. Ogden says he had no pistol that night, and when the difficulty began neither Helman nor Brady had any weapons. Brady, Helman, Berwald, and Mr. and Mrs. Wiel are all Jews, and Mrs. Rubenstein's house is a Jewish boarding-house, and all of the above named witnesses for the State boarded at this house. Joe Helman's evidence is substantially the same as Ogden's up to the time the Clay boys came across the street and

made the attack on Ogden and Brady, but he stated that when E. G. Clay struck Ogden and A. L. Clay struck Brady with his hands (no weapons being used up to this time by anyone), he (Helman) ran and fell down over some lumber, and he saw Brady and defendant down on Ross Avenue, and defendant was cutting Brady with a knife, and Brady cried out "Help me, he is killing or cutting me." Helman then ran down to Mrs. Rubenstein's crying "Help! help," etc. Mrs. Weil came out on a porch and handed Helman a pistol, and Helman shot it off in the air first, but finally his courage returned and he shot two shots at A. L. Clay, who was still engaged in the fight with Brady, and was still cutting him with the knife.

The above covers the salient points of this prosecution from the standpoint of the only State's witnesses who saw the beginning and ending of this unfortunate occurrence. The defendant's case and his line of defense are embodied in his and his brother's evidence, and as stated above this testimony is in direct conflict with that of the State's witnesses.

Defendant and his brother, E. G. Clay, were together on this fatal night. They were both drinking; were "on a spree." They were not acquainted with either Brady, Ogden, or Helman; had never seen either of them before the difficulty. The Clays were at a saloon on Lamar Street, about 500 feet from the corner where the conflict occurred, with the deceased and his two associates and friends. They lived on Ardrey Street, and left the saloon about midnight to go to their home. They started home by the nearest route, which led them up to the point on the corner where Ogden, Brady, and Helman were stationed. As they proceeded down Lamar Street, at the corner of Ross and Lamar, they noticed what appeared to them to be a crowd of men standing on the corner. They did not know who they were. They paid no especial attention to the men until they heard one of them remark, "There comes the damn sons of bitches;" and one also said, and this one proved to be the deceased, "Let them come; I am fixed for them now." When Brady made this remark he threw his hand around behind him as if he intended to draw a pistol. By this time the Clay boys were almost within striking distance of the men. Deceased then drew his pistol and threw it down in the face of the defendant. Defendant grabbed his arm, and said to him, "Hold up, you have got the wrong parties." Defendant did not know what motive animated this strange and sudden attack on him and his brother. It was in the nighttime. He knew not whether the strange conduct of their assailants meant robbery, murder, arrest, or what. Why this drawing of the pistol and flashing it suddenly in his face What dark and sinister motive animated this sudden and unprovoked attack? Defendant jumped and seized the pistol in his right hand, threw it up and as he did so he "ducked his head" and as he did this the first shot was fired and defendant at the hands of deceased received a glancing shot in the crown of his head. Defendant and deceased struggled out across Ross Avenue, defendant still holding

the hand of the deceased in which he held the pistol and deceased crying out all the time "Shoot him." And thén defendant threw the hand around in which deceased held the pistol, and deceased shot a second time, the ball penetrating the fleshy part of defendant's arm. Defendant was powder-burned also in the corner of his mouth. Three shots were fired by deceased while the struggle lasted. After the first shot was fired defendant drew his knife and cut the deceased several times during the struggle and while he was holding deceased's hand. While this was going on, Ogden, who had finished up the other Clay, joined in with the deceased Brady, and both of them joined forces, Ogden using a board or stick and deceased his pistol, whereupon deceased said to Ogden, "Here, take this pistol and shoot him," and Ogden took the pistol from deceased's hand, and as he did this defendant cut Ogden with his knife, and the latter left his friend and ran away. Defendant then left and went in search of his brother, E. G. Clay, told him he was shot all to pieces, and the two started down the street towards home, and when the two got about fifty feet off they heard three more pistol shots. When they got to Howard Street they were arrested by two officers, and defendant said, when placed under arrest, to the officers, "You are arresting the wrong parties; you ought to arrest the other parties; they jumped on us first; we got the worst of it; I am shot in two or three places and we are both beat up."

During the time Brady and defendant were engaged, Ogden and Helman had A. G. Clay in charge and were beating and kicking him.

With regard to the special venire, the facts seem to be that the whole venire in this cause was summoned by the sheriff mailing each venireman a postal card. To this card was attached a return card, and when a venireman received such a card, the same instructed him to mail the attached postal, which was addressed to the sheriff, and when the sheriff received such attached postal, he returned said venireman served; if he never received it, he returned him not found. The defendant made a motion to have said return amended and a truthful return made which would show the facts, and offered to prove the facts in his motion. The court refused to hear proof, and overruled said motion.

The defendant made a motion to quash the venire, which was overruled. This question was raised by excepting to each and all of the veniremen as presented, and defendant exhausted his challenges and a jury was forced upon him.

*Hudson & Woody* and *Joe W. Taylor,* for appellant.—With regard to summoning a special venire the statute says: "Which summons shall be verbally made upon the jurors in person." Wills. Code Crim. Proc., art. 613. We submit that it has not been complied with in this case. What is meant by a personal service is susceptible of but one simple construction, and that is for the sheriff to go and personally deliver such a notice.

Now, the statute in garnishment proceedings, in language, is similar

to the language in our procedure. The fact that the garnishee knew of the writ was not sufficient.

We take it that every venireman was presumed to know the law. If he did, and our Code of Criminal Procedure means what it says, when it says they shall be served with personal service, he knew he did not have to attend. The court could not fine him when he failed to attend, because there had been no legal service. This accounts for the small number (sixteen out of sixty) who were in attendance on this case.

No one but some idler, or interested party, or ignorant man, who did not know the law, would attend under such a summons, and the defendant is thereby deprived of having the better and disinterested citizen which this statute in its extraordinary method seeks to guarantee.

As shown, the court compelled the defendant to exhaust said sixteen, and he then issued additional process for the absent ones, but ordered talesmen and compelled defendant to select and pass upon said talesmen without waiting for the process to be served upon said absent veniremen. The defendant took the position in this case that as no veniremen had ever been legally summoned, the court had no right to attach them. The court then issued a subpoena for them. This was the first legal notice that they had ever had, and hence, before we could be compelled to pass upon them, the sheriff should make a return of such fact, and we have one day's notice and service of said list before being called upon to pass upon the same. The defendant in this case did not have such a jury as the law gives him; he had one who had interest enough to voluntarily give their services, and such as the sheriff selected for talesmen. There was no legally summoned venire, hence the court could not order a set of talesmen until a legal venire had been exhausted. Before the revision of our criminal statutes in 1879, the Court of Criminal Appeals, in the case of Cordova v. State, 6 Texas Criminal Appeals, 223, under a statute providing that the officer summoning a venire could leave a written notice with anyone over fourteen years old, said: "It would be better practice in all capital cases for the sheriff or deputies to summon in person all named in the writ when it can be done."

Thereafter, from some cause, our present statute was enacted, which is conclusive evidence that if the Legislature was satisfied with the statute then, they would have never changed it and enacted the present one (article 654, Code of Criminal Procedure), as to one day's service of the names of the venire served as mandatory. Kellum v. State, 33 Texas Crim. Rep., 82.

It is useless to have a statute which segregates capital cases from all others and prescribes a certain and specific mode of procedure in the selection of juries therein, if it is to be ignored with impunity. In this case sixty men were drawn on the special venire, but only sixteen answered to their names, and not a single one was ever summoned. Those sixteen were simply volunteers. The defendant in a capital case is entitled to have his jury summoned, listed, and served on him in form of

a copy, one whole day before he is placed upon trial. If sheriffs and courts are permitted in certain localities for convenience to ignore this law, let it be repealed. "A defendant in a capital case is entitled to one day's service of a copy of the names of persons actually summoned under the special venire." Peticolas Crim. Index Dig., p. 419, sec. 282, and cases there cited; Harrison v. State, 3 Texas Crim. App., 565.

"Before the defendant in a capital case can be legally forced to trial, he is entitled to one day's service of a copy of the names of the persons summoned. * * * A denial of the right is error." Houillion v. State, 3 Texas Crim. App., 540.

Defendant made a motion to quash the venire, which was overruled by the court, and denied the defendant the right to prove the facts set out in said motion to be true, which was duly excepted to in limine.

Defendant also made a motion to have the sheriff.to amend his return, showing that the return on the writ was false as to the manner of service and the diligence used as to those not served, which was refused, and was duly excepted to at the time.

Defendant followed up this error by protesting against being forced to pass on these volunteer jurors. Bates v. State, 19 Texas, 123; Speer v. State, 2 Texas Crim. App., 247; Osborne v. State, 23 Texas Crim. App., 443; Thuston v. State, 18 Texas Crim. App., 31; Drake v. State, 5 Texas Crim. App., 654; Kellum v. State, 33 Texas Crim. Rep., 82; Swofford v. State, 3 Texas Crim. App., 87; Thompson v. State, 19 Texas Crim. App., 593; Neyland v. State, 13 Texas Crim. App., 536; Charles v. State, Id., 658; Rodriquez v. State, 23 Texas Crim. App., 503.

The court erred in forcing the defendant to take the stand after the defendant had closed his testimony in chief and while the State was introducing its evidence in rebuttal, and compelling defendant to answer the following questions: "If, on the night of the homicide, a short time before and near the place of the homicide, defendant and his brother, E. G. Clay, were in a saloon, and if defendant's brother did not, in said saloon, take Broadhurst by the arm up at the bar and did not try to make him treat, and if the defendant did not also come up to Broadhurst and also catch Broadhurst by the arm, and say to him: 'Set 'em up, you damned son of a bitch!' And further, did not your brother E. G. Clay at another time and in another place say in your presence, that 'We are out on our toughness to-night?'"

Any defendant in a criminal action may testify in his own behalf, and while on the stand he may be cross-examined or impeached just as any other witness; but the State has no right, after defendant has closed his testimony in chief and been excused as a witness, to open up its rebuttal evidence by making a witness for the State out of the defendant.

The court erred in permitting the State to prove by J. Burwald, in rebuttal, that on the night of the killing, in front of the Wichita saloon, E. G. Clay, defendant's brother, took him by the arm and told him he was a "damn son of a bitch," and that the defendant then came up and said to him, "Set 'em up, you damn son of a bitch."

The court erred in permitting the witness Broadhurst to state on behalf of the State, in rebuttal, that "some time between ten and fifteen minutes before this shooting occurred, defendant and his brother came into O'Harris' restaurant, and defendant's brother said in defendant's hearing and presence, 'We are out on our toughness to-night.'"

We refer the court to the statement under the sixteenth assignment of error; also bills of exception numbers 2, 3, and 4, in which a full and complete history of the illegal evidence is given, and the grounds of the defendant's objection thereto.

It is furthermore a rule of law that a witness can not be impeached in matters irrelevant, immaterial, and collateral, which have no bearing upon the point at issue. The credibility of a defendant can not be impeached by showing, even on his cross-examination, that he has been guilty of or has been charged with misdemeanors, such as affrays, assaults, and the like, and if the defendant has been guilty of infamous crimes involving moral turpitude and the State sees fit to introduce evidence of it to go to his credit, the court should always limit the purpose of the evidence in its charge. Upon either horn of the court's dilemma here it is in error. If the evidence was admissible it should have been limited. It was not admissible. Brittain v. State, 36 Texas Crim. Rep., 406.

It was not proper impeaching evidence, for the reason that as direct evidence it was irrelevant and immaterial. It was collateral to the main issue. Drake v. State, 15 S. W. Rep., 727; Greenl. on Ev., sec. 455; Hart v. State, 15 Texas Crim. App., 202; Johnson v. State, 22 Texas Crim. App., 206.

*R. B. Allen, W. M. Chandler, Stillwell H. Russell,* and *Robt. A. John,* Assistant Attorney-General, for the State.—With regard to the special venire, every defendant in a capital case is entitled to a special venire of jurors, and is entitled to have them drawn from a box, the names listed in their order, and attached to a writ in due form. He is entitled to have the persons named summoned. In this case they were summoned by the sheriff mailing to each one a written notice, and attached to each was a return card, upon which they were to personally write and sign their names acknowledging the summons.

It is important to have the jurors summoned, but the method used by which the summons is completed is directory. The man who was drawn must be summoned, and his name furnished the defendant.

To direct that he be verbally summoned is for the benefit of the juror and not for the defendant, so as to place beyond cavil the fact that he was notified that the court might fine him if he did not appear.

What possible good could accrue to the defendant to have the jurors verbally summoned, as against the same jurors being summoned in writing by mail, when he, in person acknowledged service of the summons?

What right of the defendant has been impaired, when he comes upon the written notice? What injury has resulted to the defendant if the name that has been drawn and served upon him comes at the written invitation of the sheriff, instead of the verbal invitation.

Suppose the sheriff had called up the jurors, whose names had been drawn in a capital case, over the phone, and then told them they were summoned; this would not be a literal compliance with the character of summons mentioned in article 613, and yet the jurors would be verbally summoned. Suppose the sheriff summoned each one of the jurors by phone, in language held in person with the jurors; still under the contention of appellant, the sheriff not having gone to the juror in person, and not personally coming in contact with him, there would not be a legal summons.

The Mississippi statute requires that the grand jurors shall be summoned at least five days before the first day of the court; but the Supreme Court of that State, in treating whether the statute was mandatory or directory, through Handy, Judge, said: "It is manifestly merely directory to the sheriff, and for the convenience of the juror." The time of summoning jurors, except as far as their own convenience is concerned, is quite immaterial, which could in nowise effect their official acts. Johnson v. State, 33 Miss., 364.

The Maine statute says venires for jurors shall be issued forty days, at least, before the second Monday in September, annually. In the case of the State v. Smith, the counsel for the prisoner claimed and insisted that the statute was imperative, and that the venire issued by the clerk after the expiration of the forty days was void; the contention of he State was that it was valid. The lower court sustained the motion to quash the venire, and the State appealed. We refer this court to the opinion in that case (67 Maine, 328), as it contains an exhaustive discussion of the construction and intendment of statutes, and numerous authorities are therein cited. Endl. on Con. of Stats., secs. 435, 436, 437; State v. Pitts, 58 Mo., 556; State v. Carney, 20 Iowa, 22.

It is clear, as a proposition, that where the object contemplated by the Legislature could not be carried into effect by any other construction, the method prescribed must be considered imperative; and the converse is clearly true, that where it can be carried into effect by another construction, it is directory merely. The prime object of the law being to have the jurors notified, how he is to be notified is of secondary importance.

The method adopted by the sheriff in this case has many advantages over the method suggested in article 613. Clearly, no right of the defendant is involved in the method used. Clearly, the purpose of the lawmakers is subserved when the jury is summoned.

As a matter of fact, as shown by the bill, all but three of the jurors were summoned,—call it notified if you please; well, it was a notification by the sheriff which summoned them to be present, and all but three were summoned.

An attachment can not issue for a juror who has not been summoned, but can it be doubted that under the character of the summons made in this case an attachment could issue? The court offered counsel process for absent jurors, but they refused it, unless they could have those who were resummoned served upon one entire day.

Appellant had already had one entire day's service of the identical names, for which he demanded one more day's service. This was an arbitrary demand. The conditions required by appellant were trivial, and made it apparent that it was a bill he was after, and not a juror. He got the bill.

Process was issued for the absent jurors, anyway, and they were verbally summoned, to meet the captious demands. Many came and some did not, as shown by the explanation to the bill. The court refused to delay the case, and in this it exercised the right given. Articles 618, 619, 620, and 621 have been held by this court to be directory, merely.

The honorable trial court and the sheriff of Dallas County have adopted a method in summoning jurors that is far better, safer, and more convenient to the juror, and certainly much better calculated to reach all the jurors on the writ than the method suggested in article 613. It provides and insures certain summons, if the juror is still living and in the county. It provides against laches or disinclination to hunt the juror, or upon failing to find him in the first instance to persist in hunting him. In this way the name drawn is notified, and in person acknowledges the summons over his own signature, and what possible injury to the defendant is done, or what possible difference to him, whether the juror comes at a verbal or written invitation of the sheriff?

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty years; and he appeals.

Two distinct theories are presented in the case. The State's testimony shows an unprovoked and deadly assault on the part of defendant A. L. Clay, and his brother E. G. Clay, on the deceased, Brady, and his two companions, Helman and Ogden. Appellant's theory was self-defense, and his testimony suggested an unprovoked and deadly assault on himself and his brother E. G. Clay, by deceased, Brady, and his companions, Helman and Ogden.

Appellant reserved a number of bills of exception to the action of the court with reference to the summoning of the special venire and the impanelment thereof. A special venire of sixty men appears to have been properly drawn in the case under the direction of the court. The sheriff undertook to summon them by addressing to each of said jurors, at his postoffice, a postal card, informing him that he had been drawn on said special venire, and the day the case was to be tried, and notifying him to be present; and attached to said card was a return postal card, addressed to the sheriff, which said venireman was instructed, in the said postal received by him, to tear off and mail

back to the sheriff, notifying him that such juror was served. The return of the sheriff was made up from the replies so received,—merely showing on its face that the jurors so notifying the sheriff had been served. Out of said list of sixty, sixteen appeared, twenty-five did not appear, and sixteen had been excused by the court, and three were returned "Not found." As stated above, the return, on its face, only showed a regular service in the ordinary way, according to the statute. Appellant made a motion to quash the venire, setting up the facts, and asked that the sheriff be required to amend his return, stating how said service was made. This motion was refused by the court. Appellant also offered to make proof of how said service of the venire had been made. This, also, was refused by the court. Appellant presented this same matter in a bill of exceptions when the special venire were presented in court, and he was required to pass on same, setting up the same facts substantially as presented in his motion to quash. In this connection the court offered to have an attachment issued for each of said jurors who appeared to have been served, but were not present, and who had not been excused by the court. Appellant objected to this, unless he should be furnished with a list one entire day before he was compelled to pass upon the same. The court explains this bill by stating that the list showed that all of said special venire had been served except three, and the defendant objected to said venire because it had been summoned by postal card. And the court offered to have process issued for said defaulting jurors, and defendant objected because they had not been legally summoned. The court further states that the sheriff did actually summon in person all of the jurors who failed to appear in answer to the original service, but how many actually came into court, the court had no record of. The court did not wait for the absent veniremen, but had talesmen summoned, whom the defendant was required to examine and pass upon without reference to whether the absent veniremen had been summoned or not. When the special venire had been exhausted, the court ordered the talesmen. When these were brought in, the same objections were urged, to wit, that appellant had never been confronted with a special venire summoned according to law, and that he should not be compelled to go to trial until he had a legally summoned venire. So it seems that, in every conceivable way, appellant insisted that a special venire had never been legally summoned in his case; and we are accordingly presented with the question whether in a case in which the law guaranties to a defendant a trial by special venire, he is entitled to have same summoned according to law. Article 650, Code of Criminal Procedure, reads as follows: "The sheriff or other officer executing the writ shall summon the persons whose names are upon the list attached to the writ, to be and appear before the court at the time named in such writ, which summons shall be made verbally upon the jurors in person." The succeeding article requires the officer to return the writ promptly on or before the day the writ was made returnable, stating the names of those who had

been summoned; and, if any names are on the list that have not been summoned, the return must state the diligence which has been used to summon them, and the cause of the failure. A copy of the list as returned by the sheriff shall be made out and certified by the clerk and served on defendant at least a day before his case is called for trial. And it has been held that, unless this is waived, it is mandatory. Burries v. State, 36 Texas Crim.• Rep., 13. If appellant is entitled to a special venire, he is entitled to have one drawn and summoned according to our statutes on the subject. The service of the venire in this case illustrates the necessity of adhering to the plain letter of the statute in summoning the list as drawn. The article quoted above requires a personal service by the sheriff on each juror drawn on the special venire. Not only so; if he fails to make the summons on any particular juror, he is required to state the diligence used to procure such juror. In this case no attempt was made to follow the statute, but an absolutely new departure was made, unknown to and unauthorized by the law. As a result, no obligation rests upon those who were written to, to attend the court; and we find that but few obeyed the summons,—no doubt, from knowledge of the fact that they were not required to obey such service. Out of the total list of sixty, but sixteen were present, when ordinarily there should have been at least fifty present on the special venire, from which to draw a jury. The great majority of them were absent. It is not a question of prejudice, for it would be difficult to show prejudice under such circumstances. Nor is it a response to the proposition to say that appellant was furnished with a fair and impartial jury. However this may have been, it was not the tribunal erected and provided by law for his trial. And if the court can abrogate the statute, as was done in this case, he can do it in every instance; and instead of furnishing the defendant with a special venire as provided by law, the court may furnish a defendant with a jury selected by the court, and not through the legal machinery as required by our statutes on the subject. It is not necessary here to discuss the importance to a defendant in a capital case of being tried by a jury of his peers as provided by law. Its importance is too well recognized to require discussion or authority, and all of our statutes in this connection are made as safeguards to preserve it; and to hold that the jury as summoned in this case, and who responded to the summons, was a legal venire, would be to undo and destroy the procedure provided by law, and to authorize another mode of summoning the jury in a capital case. We are not now discussing a case in which all of the special venire as drawn were present. Here only sixteen out of a total of sixty attended the trial. We hold that the service made by the sheriff in this case was tantamount to no service at all, and that appellant was, in effect, deprived of a special venire, which the law guaranties him.

The court excused a number of jurors in the absence of appellant. If we could consider that appellant was furnished with a special venire,

of course there was no authority on the part of the court to excuse such special veniremen in the absence of appellant. Livar v. State, 26 Texas Crim. App., 115.

It appears that appellant took the stand in his own behalf, and was examined in chief, and cross-examined by the State, and stood aside. Subsequently he was recalled by the State, and asked "if he did not, on the night of the homicide, a short time before, near the place of the homicide, when he and his brother were going in a certain saloon,— if he [defendant] did not try to make one Broadhurst treat, and if he did not catch Broadhurst by the arm, and say to him, 'Set 'em up, you damn son of a bitch.'" And further he was asked "if a short time before that, in a restaurant on the same night, his brother, E. C. Clay, did not say, in his presence, to a certain party that 'we are out on our toughness tonight.'" This was objected to on the ground that it was incompetent for the State to put him back on the stand and prove these matters by him; that, his examination having been closed, to again put him on the stand was to make him a witness against himself, and, besides, the testimony elicited was not germane to his examination in chief, and was also objectionable, as his testimony did not concern the homicide. With reference to the first objection (that is, "that it was not competent to put him on the witness stand again"), we know of no rule that would make any distinction between him and any other witness; and it is allowable to call a witness back who may have been previously examined, in order to lay a predicate for the impeachment of such witness. We do not regard the testimony as irrelevant. On the contrary, in our opinion, it was original testimony, tending to show the condition and state of mind of appellant immediately preceding the homicide. It was competent for the State to show the movements of the defendant and his brother shortly before the homicide. There was a sharp issue between the State and the defendant as to who provoked and brought on the difficulty; the State's testimony showing that defendant and his brother, acting together, brought it on, and defendant's testimony tending to show that deceased and his companions brought it on. All the evidence indicates that whichever side provoked it was actuated by a reckless disposition, and utterly disregardful of the rights of others. As illustrative of this, and as tending to support the theory of the State, it was competent to show that defendant and his brother, who were shown to be acting together in the difficulty, were together before the difficulty, were drinking and carousing, and manifesting a turbulent and lawless disposition; and the testimony admitted, as we understand it, tended to show this state of things. More than that, the testimony on the part of the State shows that defendant and his brother, as they approached deceased, remarked, "Yonder are the sons of bitches now." The testimony admitted and complained of shows that, some fifteen minutes before, appellant and his brother were treating witness Broadhurst in a violent and lawless manner, and endeavored to make him treat, and called him a "son of a bitch," and that he escaped from them

and ran out of the saloon. This testimony is suggestive of what subsequently occurred when these parties approached deceased and his companions. In our opinion, the testimony was admissible.

Appellant raises a number of questions as to the charge of the court, but, in the view we have taken of the case, we deem it unnecessary to discuss the questions therein raised. For the error discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*